**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CRYSTAL DENISE BRUNSON,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO.   22-cv-3993** |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

## <u>MEMORANDUM OPINION</u>

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                    **September 8, 2023**

Plaintiff Crystal Denise Brunson brought this action seeking review of the Acting

Commissioner of Social Security Administration's decision denying her claim for Social

Security Disability Insurance (SSDI) and Supplemental Security Income (SSI) benefits under

Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  This

matter is before me for disposition upon consent of the parties.  For the reasons set forth below,

Plaintiff's Request for Review (ECF No. 10) is **GRANTED**, and the matter is remanded for

further proceedings consistent with this memorandum.

## I.      PROCEDURAL HISTORY

On February 13, 2015, Plaintiff filed for SSDI and SSI, alleging disability since August

1, 2014 (later amended to January 1, 2015), due to back problems, lower back injury and neck

pain.  (R. 114, 226-239, 257).  Plaintiff's application was denied at the initial level, and Plaintiff

requested a hearing before an Administrative Law Judge (ALJ).  (R. 133-42, 145-48).  Plaintiff,

represented by counsel, and a vocational expert testified at the July 18, 2017 administrative

hearing.  (R. 77-116).  On November 22, 2017, the ALJ issued a decision unfavorable to

Plaintiff.  (R. 57-75).  Plaintiff appealed the ALJ's decision, but the Appeals Council denied

Plaintiff's request for review on October 25, 2018, thus making the ALJ's decision the final

decision of the Commissioner for purposes of judicial review.  (R. 7-13, 223-25).  Plaintiff

appealed to the United States District Court for the Eastern District of Pennsylvania on

December 27, 2018.  *Brunson v. Comm'r of Soc. Sec.*, No. 2:18-cv-05562-DS (E.D. Pa. Dec. 27,

2018) (ECF No. 2).

On April 11, 2019, Plaintiff filed a new application for SSI.  (R. 1163).  On November

14, 2019, the state agency found that Plaintiff was disabled as of the new application date.  (R.

1163, 1214-49).

On July 26, 2019, the Honorable David R. Strawbridge remanded the original matter for

further proceedings, and on September 8, 2020, the Appeals Council directed the ALJ to

consider only the period prior to the award of benefits on April 11, 2019.  (R. 1052-57, 1089-

1103).  Plaintiff, represented by counsel, and a vocational expert testified at a December 8, 2020

administrative hearing.  (R. 972-1045).  On January 28, 2021, the ALJ issued a decision

unfavorable to Plaintiff.  (R. 1113-39).  Plaintiff appealed the ALJ's decision, and the Appeals

Council remanded the matter on September 24, 2021, because the ALJ determined that Plaintiff

was not disabled beyond the point that she had already been found so (April 11, 2019) and

because the ALJ applied regulations that were not in effect at the time of Plaintiff's filing.  (R.

1140-46).

On February 18, 2022, Plaintiff and a vocational expert testified at another administrative

hearing.  (R. 935-71).  On April 15, 2022, the ALJ issued a decision unfavorable to Plaintiff.  (R.

902-34).  Plaintiff appealed the ALJ's decision, but the Appeals Council denied Plaintiff's

request for review on August 11, 2022, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  (R. 895-901).

On October 6, 2022, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania and consented to Magistrate Judge Strawbridge's jurisdiction pursuant to 28 U.S.C. § 636(C) four days later. (Compl., ECF No. 1; Consent, ECF No. 6).  On February 14, 2023, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 12).  The Commissioner filed a Response on March 17, 2023, and on March 26, 2023, Plaintiff filed a reply.  (Resp., ECF No. 12; Reply, ECF No. 14).  On July 27, 2023, this case was reassigned to me, and on August 1, 2023, the parties consented to my jurisdiction.  (Order, ECF No. 15; Consent, ECF No. 17).


## II.     FACTUAL BACKGROUND[1]

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on November 26, 1962, and was 52 years old on the alleged disability onset date.  (R. 253). She completed two years of college.  (R. 258).  Plaintiff previously worked as a claims examiner for a health insurance company and as a kitchen aide at a school.  (*Id.*).

### A.     Medical Evidence

Between February and April 2015, Plaintiff was treated at Nevyas Eye Associates in Bala

---

[1]  Plaintiff's challenges to the ALJ's decision primarily concern her sarcoidosis, uveitis and fibromyalgia.  However, as set forth in § V.B, the Court resolves the issue related to her fibromyalgia solely on legal grounds.  Accordingly, the Court's summary of the medical evidence in this matter focuses on Plaintiff's sarcoidosis, uveitis and related symptoms, in addition to the opinions offered by the various medical sources applicable to the relevant review period.

Cynwyd, Pennsylvania, for uveitis and related symptoms, including photosensitivity, episodic inflammation, blurry vision, posterior synechiae and the inability to read fine print. (R. 490-95). She denied flashes, pain, pressure, tearing and itching. (*Id.*) Plaintiff was prescribed eyedrops and referred to a uveitis specialist. (R. 490, 495).

On April 21, 2015, State agency medical consultant Minda Bermudez, M.D., opined that Plaintiff could occasionally lift and carry up to 50 pounds and climb ladders, ropes, and scaffolds; frequently lift and carry up to 25 pounds, climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; sit or stand/walk for up to six hours per workday; and push and pull without additional limitations. (R. 120-21, 129-30). She further determined that Plaintiff could tolerate heat, extreme humidity, noise, hazards and respiratory irritants without limits, but that she must avoid concentrated exposure to extreme cold, wetness, and vibration. (*Id.*).

In May 2015, Plaintiff was evaluated for uveitis at Scheie Eye Institute in Philadelphia. (R. 607). She complained of photosensitivity, chronic floaters and intermittent redness and blurred vision but denied eye pain and flashes. (R. 607). She was diagnosed with chronic anterior uveitis and noted to have "some features compatible with sarcoidosis." (R. 609). Her inflammation was described as "mostly but incompletely controlled" and "mildly symptomatic." (*Id.*). Her prescription for prednisolone acetate eyedrops was replaced with Durezol. (*Id.*). She returned in July 2015 and reported that she had been unable to obtain Durezol due to insurance issues and had instead continued with prednisolone acetate and Cosopt twice daily. (R. 621). Her photosensitivity and near vision had worsened. (*Id.*). Plaintiff was given a coupon for Durezol. (R. 624).

Between September 2015 and March 2017, Plaintiff was treated at Mid Atlantic Retina's Uveitis Clinic for idiopathic bilateral uveitis. (R. 477-89). At her initial visit it was noted that

she previously had burning while taking prednisolone acetate six times daily but that this had improved after reducing to twice daily.  (R. 488).  Her December 2015 visit involved further medication management, and it was noted that she could see well enough to pass a driver's license without corrective lenses.  (R. 487).  In June 2016, she had some photosensitivity but no flashes, and her vision was "doing well overall."  (R. 483).  Her prednisolone acetate dosage was increased in January 2017.  (R. 481).  In March 2017, her uveitis had improved and her cyclopentolate prescription was discontinued, but she complained of moderate, hazy blurred vision that "comes and goes."  (R. 477-78).

On December 7, 2016, Plaintiff was admitted to the hospital for worsening nutritional status and for a further pancreatic cancer workup after she was previously found to have a mass in October 2016.  (R. 456).  Imaging showed marked abdominal and mild pelvic lymphadenopathy with metastatic cancer likely not the cause.  (R. 456).  She was discharged on December 10, 2016, in "good condition" following a clear diet while in the hospital.  (R. 457).

Plaintiff was seen at the Penn Medicine Division of Rheumatology in March 2017 for recurrent abdominal pain, nausea, vomiting and shortness of breath, especially upon exertion. (R. 890).  It was noted that prior imaging showed "significant adenopathy suspicious for lymphoma."  (*Id.*).  Approximately one week later, she reported to her primary care physician, Lee Powell, D.O., that she was feeling better, with a good appetite and good overall health.  (R. 818).  In April 2017 Plaintiff was diagnosed with "sarcoidosis which is likely affecting her lungs given her complaints of shortness of breath . . . ."  (R. 885).  A pulmonary function test performed at this time returned normal results except for "borderline DLCO [diffusing capacity of the lungs for carbon monoxide]."  (R. 1592-94).  A June 2017 CT scan showed that tiny lung nodules visible on a March 2017 scan remained unchanged.  (R. 1594).

5

On July 12, 2017, Plaintiff's rheumatologist, Antoine Sreih, M.D., opined that Plaintiff had a guarded prognosis due to her sarcoidosis and related abdominal pain, joint pain, fatigue, and general malaise. (R. 875). Her abdominal pain was described as severe and worse with palpitation, and there was evidence of abdominal masses in imaging. (*Id.*). He noted that Plaintiff had responded well to high-dose steroids but had developed myopathy, mood swings, fatigue, and weight gain. (*Id.*). He indicated that emotional factors did not contribute to the severity of her pain but that depression and anxiety "affect[ed] [her] physical condition." (R. 876). He predicted that her symptoms would frequently (defined on the form as between one- and two-thirds of the time) interfere with her attention and concentration to the extent that she would be unable to perform even simple work tasks. (*Id.*). He indicated that she could not handle even low-stress jobs. (*Id.*). Dr. Sreih stated that Plaintiff could only walk one-half of a block and sit or stand for 20 minutes at a time and less than two hours in a workday. (R. 876-77). He noted that she would have to walk for 15 to 20 minutes every hour and that she would need unscheduled breaks, but that she did not need a cane or assistive device for occasional walking or standing. (R. 877). He concluded that she could never lift 10 pounds or more, twist, stoop/bend, crouch/squat, or climb ladders; rarely lift less than 10 pounds; occasionally look up, down, left and right or climb stairs; and frequently hold her head in a static position. (R. 877-78). He found that Plaintiff had no significant limitations with reaching, handling or fingering, and he denied that her impairments were likely to produce "good days" and "bad days." (R. 878).

The following day, Plaintiff's orthopedist, Monroe Szporn, M.D., opined that Plaintiff had a fair prognosis due to her sarcoidosis, diabetes, cervical radiculopathy and related neck, lower back, shoulder, and arm pain, numbness, and tingling. (R. 881). Her pain was described

as daily and radiating and made reaching overhead difficult.  (*Id.*).  He noted that Plaintiff had

been treated with steroid injections.  (*Id.*).  He indicated that emotional factors "probably"

contributed to the severity of her symptoms and limitations.  (R. 881-82).  He predicted that her

symptoms would occasionally (defined on the form as between six and 33 percent of the time)

interfere with her attention and concentration to the extent that she would be unable to perform

even simple work tasks.  (R. 882).  He indicated that she could handle low-stress jobs.  (*Id.*).  Dr.

Szporn stated that Plaintiff could only walk one to two blocks, sit for two hours and stand for one

hour at a time, and sit for four hours and stand/walk for two hours in a workday.  (R. 882-83).

He noted that she would have to walk for five minutes every 90 minutes and that she would need

unscheduled breaks every three to four hours for 15 minutes and elevate her legs to waist level

one-quarter of the workday.  (R. 883).  He wrote that she would "possibly" require a cane or

other assistive device while standing and walking.  (*Id.*).  He concluded that she could never

climb ladders; rarely lift 50 pounds or crouch/squat; occasionally lift 20 pounds, turn her head in

all directions or hold it still, twist, stoop/bend, or climb stairs; and frequently lift 10 pounds or

less.  (R. 883-84).  He found that in a workday Plaintiff could, on her right side, grasp, turn and

twist objects 40 percent of the time, perform fine manipulations 30 percent of the time, and reach

including overhead 20 percent of the time, and on her left side grasp, turn and twist objects 70

percent of the time, perform fine manipulations 50 percent of the time, and reach including

overhead 75 percent of the time.  (R. 884).  He predicted that Plaintiff's impairments were likely

to produce "good days" and "bad days" and that she would be absent from work because of them

about two days per month.  (*Id.*).

On July 31, 2017, Plaintiff underwent a biopsy of an abdominal mass related to her

sarcoidosis and lymphadenopathy, which revealed fibrous tissue with predominantly non-

necrotizing granulomatous inflammation.  (R. 1597).  In January 2018, she had an upper gastrointestinal endoscopy with normal results.  (R. 1710-11).  A March 2018 CT scan of her abdomen showed "[g]rossly unchanged upper abdominal lymphadenopathy" possibly "secondary to sarcoidosis" with "[a]dditional pelvic lymphadenopathy . . . ."  (R. 1543).  In July 2018, Plaintiff reported to her rheumatologist, Colin Ligon, M.D., that her breathing had been "OK as long as [she] stays out of the heat" and that following the removal of cecal polyps her nausea and vomiting had not recurred.  (R. 2171).  She further reported that medical marijuana had helped with her symptoms.  (*Id.*; *see also* R. 2231, 2238, 2261).

Returning to Plaintiff's uveitis, she again went to Mid Atlantic Retina in July 2017, at which time her uveitis was "suppressed" and her prednisolone acetate dosage was decreased.  (R. 1848).  However, she had mild intermittent blurred vision with tearing and throbbing.  (R. 1847).  At her next visit in December 2017 her uveitis was "inactive," albeit with moderate, worsening blurred vision.  (R. 1844).  In March 2018, her uveitis was "suppressed" and her "ocular manifestations [were] under control," although she was noted to have "multiple medical problems; it is not clear how much of this is sarcoid-related . . . ."  (R. 1547).  She was continued on prednisolone acetate and weekly methotrexate injections.  (*Id.*).  In June 2018, her uveitis remained suppressed and her blurred vision improved.  (R. 1836).  Her uveitis was still stable in October 2018, although her vision was "fluctuating," with mild but worsening hazy vision.  (R. 1832-33).  In March 2019, she had stable vision and no eye pain, and her prednisolone acetate dosage was decreased.  (R. 1830).

On March 12, 2018, Dr. Ligon completed a Physician's Transportation Restriction Form in which he opined that Plaintiff was unable to use public transportation, including with a companion, or walk one-quarter of a mile but that she did not require an escort, a low-riding

vehicle or a wheelchair-accessible vehicle.  (R. 1523).  He noted that Plaintiff did not travel by public transportation for nonmedical purposes, such as shopping.  (*Id.*).  Dr. Ligon explained that transportation assistance was necessary due to "sarcoidosis of the abdomen causing chronic abdominal pain, vomiting."  (*Id.*).  He also wrote that Plaintiff has difficulty walking between bus stops and with "prolonged point-to-point travel . . . ."  (*Id.*).

### B.     Non-Medical Evidence

The record also contains non-medical evidence.  In an Adult Function Report dated March 6, 2015, Plaintiff stated that she was unable to move or sit or stand too long without pain, see straight, or read without getting a headache or neck pain.  (R. 265).  Her activities of daily living (ADLs) included getting her 12-year-old son ready for and walking him three blocks to school, preparing meals three to four times per week if she is "feeling good," light cleaning, sweeping, washing dishes, washing clothes once per week (with her brother carrying them for her), shopping once a month for an hour, managing money, and watching television.  (R. 265-69).  She had pain getting dressed and needed help getting up if she sits too long.  (R. 266).  She did not socialize and did not regularly go anywhere.  (R. 269).  She had difficulties lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, completing tasks, concentrating and using her hands.  (R. 270).  She could lift seven to 10 pounds and walk one quarter of a mile.  (*Id.*).  She followed written and spoken instructions "alright" or "ok" and had no problems with authority figures, but she did not handle stress as well as previously and got upset with changes to her routine.  (R. 270-71).  She used a cane and neck brace.  (R. 271).

At the July 18, 2017 administrative hearing, Plaintiff testified that she never learned to drive but that she uses ride-share apps or public transportation (including by herself) or has

people drive her places.  (R. 88).  She attended college for two years and received a medical

billing certificate.  (R. 89).  She stated that the main reason she cannot work was pain in her

neck, back and legs, twitching in her arms and fingers, muscle spasms and cramps in her toes and

hands, and "the shakes."  (R. 95).  These problems make it difficult for her to reach, sit or stand

longer than 20 minutes, walk more than half of one block, or lift and carry more than seven

pounds.  (R. 103-04).  Plaintiff also had a bout of her recurring nausea during the hearing.  (R.

105-06).  She has floaters and photosensitivity and can only watch television for 20 minutes.  (R.

101-02).  She has headaches three times per week.  (R. 106).  She described her ADLs as

sometimes making a bowl of cereal, making soup or salad for lunch or just having crackers, and

sometimes making another bowl of cereal for dinner.  (R. 99-100).  Friends drive her to the

grocery store to shop.  (R. 100).  She did laundry, but her son had to carry it for her.  (*Id.*).  She

can wipe counters but cannot perform other cleaning.  (R. 107).

Plaintiff's attorney completed a second Adult Function Report dated March 7, 2019,

because she was unable to do so herself.  (R. 1443).  Plaintiff reported pain in her neck, back,

arms, hands, legs, feet and eyes.  (R. 1434).  She was often short of breath, wheezing and

coughing, and she was photosensitive with blurry vision, nausea and headaches.  (*Id.*).  She

described her ADLs as light chores on good days and essentially nothing on bad days.  (R. 1435).

Up to five times per week, she was able to prepare a light meal in the microwave or toaster oven,

both of which were located in her bedroom so she could avoid using the stairs.  (R. 1436).  She

also did laundry every two weeks, albeit with assistance from her son carrying it, and once or

twice a week she would tidy up and organize her room.  (*Id.*).  She was being taken care of by

her son, 16-years-old at the time, and home care attendant paid for by the state.  (R. 1435).  She

had a variety of problems with dressing, bathing, hair care, feeding, using the toilet, taking

medications and other personal care.  (*Id.*).  She no longer drove but could still ride in a car or use the bus if the driver lowered it for her.  (R. 1437).  She managed her own money but needed her home health aide to pick up money orders for her.  (*Id.*).  She listened to television and watched if her eyes were not hurting but had not watched a full program in "a couple of years." (R. 1438).  She socialized with a neighbor, her son and the aide but had problems getting along with others.  (R. 1438-39).  She reported problems with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking when short of breath, stair climbing, seeing, remembering, completing tasks, concentrating, understanding, following instructions, using her hands and getting along with others.  (R. 1439).  She could lift 10 pounds but not carry it.  (*Id.*). She cannot follow written or spoken instructions or handle stress.  (R. 1439-40).  She uses a cane and hand splint.  (R. 1440).

At the December 8, 2020 administrative hearing, Plaintiff testified that she relies on others, including her home health aide, to drive her places.  (R. 986).  She stated that neighbors help her with house chores and cooking.  (R. 987).  She stated that since 2015 she has been able to walk, sit or stand for up to 20 to 25 minutes.  (R. 989-91).  She can carry seven pounds.  (R. 991).  During the relevant period, she was able to bathe and dress herself, sweep, wipe counters, bake or microwave meals, place clothes in the washer and dryer (but not carry or fold them), go to a restaurant "every once in a blue moon," and prepare soups, salads and sandwiches.  (R. 992-97).  She has used a cane since October 2018 and a knee brace and ankle support since some time prior to 2019.  (R. 1001-03, 1026).  Since 2015, she has had itchy and burning eyes and photosensitivity around fluorescent lights, floaters and visual "flashes."  (R. 1013-14, 1016-17). She wears prescription sunglasses around light.  (R. 1018-20).  She can watch television for up to 20 minutes with the brightness turned down and can read for approximately 10 minutes.  (R.

1021).  Over at least the last few years, she suffered from headaches, difficulty reaching,

shortness of breath, shaking hands and daily nausea going back several years and leading to

weight fluctuations.  (R. 1022-27).


## III.   ALJ'S DECISION

Following the most recent administrative hearing, the ALJ issued a decision in which she

made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act

       through June 30, 2017.

2.     The claimant did not engage in substantial gainful activity between January 1,

       2015, the alleged amended onset date, and April 10, 2019, the end of the period at

       issue (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3.     The claimant had the following "severe" impairments during the period at issue:

       disorders of the lumbar and cervical spine, degenerative joint disease (DJD) of the

       right shoulder, sarcoidosis, uveitis, hypertensive retinopathy, abdominal

       lymphadenopathy, and fibromyalgia (20 CFR 404.1520(c) and 46.920(c)).

4.     The claimant does not have an impairment or combination of impairments that

       met or medically equaled the severity of one of the listed impairments in 20 CFR

       Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526,

       416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, I find that during the period at

       issue, the claimant had the residual functional capacity to perform light work as

       defined in 20 CFR 404.1567(b) and 416.967(b) except she was able to

occasionally lift 20 pounds and frequently lift and/or carry 10 pounds. She could stand and/or walk for a total of about 4 hours in an 8-hour workday. She could sit for about 6 hours in an 8-hour workday. She could push/pull on an occasional basis. She was limited to frequent postural maneuvers, but she could never climb ladders, ropes, or scaffolds. She would need to avoid any exposure to unprotected heights and industrial machinery, such as cranes. She could never operate a motor vehicle, and she could have no more than occasional exposure to humidity, wetness, extreme cold, pulmonary irritants and vibration. She could perform jobs requiring frequent near acuity but needed [to] avoid more than occasional exposure to bright or flickering lights. She could perform frequent but not constant manipulative maneuvers bilaterally, however[,] overhead reaching would be limited to occasional.

6.     The claimant remained capable of performing past relevant work as a claims examiner during the period at issue. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.     The claimant was not under a disability, as defined in the Social Security Act, from January 1, 2015, through April 10, 2019 (20 CFR 404.1520(f) and 416.920(f)).

(R. 905-25).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 925).


## IV.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to

the Commissioner that he or she cannot engage in substantial gainful activity because of a

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of at least 12 months.  42

U.S.C. § 1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.  If she is not, then the
> Commissioner considers in the second step whether the claimant has
> a "severe impairment" that significantly limits her physical or
> mental ability to perform basic work activities.  If the claimant
> suffers a severe impairment, the third inquiry is whether, based on
> the medical evidence, the impairment meets the criteria of the
> impairment listed in the "listing of impairments," . . . which result
> in a presumption of disability, or whether the claimant retains the
> capacity to work.  If the impairment does not meet the criteria for a
> listed impairment, then the Commissioner assesses in the fourth step
> whether, despite the severe impairment, the claimant has the
> residual functional capacity to perform her past work.  If the
> claimant cannot perform her past work, then the final step is to
> determine whether there is other work in the national economy that
> the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4).  The disability claimant bears the burden of establishing steps one through four.

If the claimant is determined to be unable to resume previous employment, the burden shifts to

the Commissioner at step five to establish that, given the claimant's age, education, work

experience, and mental and physical limitations, he is able to perform substantial gainful

activities in jobs existing in the national economy.  *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88,

92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited.  A district court is

bound by the factual findings of the Commissioner if they are supported by substantial evidence

and decided according to correct legal standards.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir.

1999).  Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a

reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118

(3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion, the

decision of the ALJ will not be overruled as long as there is substantial evidence to support it.

*Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The court has plenary review of legal

issues.  *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).


V.    **DISCUSSION**

In her request for review, Plaintiff raises two claims:

1.    Ms. Brunson requested medical expert testimony on whether her impairments met or equaled a listed impairment on February 17, 2021. She repeated this request on February 11, 2022. The ALJ denied this request based largely on an erroneous presumption that Ms. Brunson had not made this request until February 11, 2022, one week before her administration hearing. ALJ Watson's only other reason for rejecting this opinion was that the record already contained opinions from specialists that were sufficient to make a decision. The ALJ then rejected every single specialists' opinion, without giving them deference as treating specialist opinions. No medical source of any kind ever considered whether Ms. Brunson's impairments met or equaled listings 14.06 or 14.09, and the only specialists who considered all of Ms. Brunson's impairments described disabling limitations. Because the ALJ failed to assist Ms. Brunson in developing the evidence of record related to her complex impairments, remand for further proceedings is required.

2.    Despite acknowledging the applicability of Social Security Ruling 00-4p, the ALJ relied upon an alleged lack of objective findings to reject both Ms. Brunson's subjective complaints of limitations related to fibromyalgia and the medical opinions of record. To the extent the ALJ did consider the factors relevant to assessing the reliability of Ms. Brunson's subjective complaints, the ALJ mischaracterized the evidence of record and ignored the well documented side effects reported. Because the ALJ committed significant legal error in assessing an impairment that belies objective medical findings, remand for further proceedings is required.

(Pl.'s Br., ECF No. 12, at 3-4).

### A.      Development of the Medical Evidence

### 1.      The Parties' Positions

Plaintiff accuses the ALJ of failing to assist her in developing the medical evidence of record.  (Pl.'s Br., ECF No. 12, at 4 (citations omitted)).  She observes that in February 2021, and again in February 2022, one week prior to the administrative hearing, she requested a medical expert to assist at step three in the evaluation of the evidence to determine if Plaintiff met or equaled listings 14.06 or 14.09[2] because the state agency consultants did not have the opportunity to consider these listings due to Plaintiff not being diagnosed with sarcoidosis until two years after they offered their opinions in this matter; however, the ALJ denied the request for two reasons.  (*Id.* at 4, 10 (citations omitted)).  First, she explained that Plaintiff's request for an expert one week prior to the hearing would have required its delay, but Plaintiff maintains that the ALJ could have ordered the expert any time after the Appeals Council's remand on September 24, 2022.  (*Id.* at 5 (citations omitted)).  Second, the ALJ denied the request because the record already contained evidence from specialists who treated Plaintiff for sarcoidosis, uveitis, and other impairments, but Plaintiff dismisses this basis as "disingenuous at best" because the ALJ afforded only "partial weight" to Dr. Sreih's (the specialist who treated Plaintiff's sarcoidosis) and Dr. Szporn's (Plaintiff's orthopedist) opinions concluding that Plaintiff had disabling limitations.  (*Id.* at 5, 9 (citations omitted)).

Plaintiff further observes that under the former regulations applicable to Plaintiff's claim, filed in 2015, a treating physician's opinion is normally entitled to "special deference" and "more

---

[2]  These listings pertain to undifferentiated and mixed connective tissue disease and inflammatory arthritis, respectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 14.06, 14.09.

weight," if not "controlling weight."  (*Id.* at 6-7 (citations omitted)).  She claims that, nonetheless, the ALJ improperly substituted her own lay judgment in determining that these physicians' opinions were not supported by objective evidence, as particularly shown by her determination that Plaintiff's cervical MRI was insignificant even though Dr. Szporn disagreed. (*Id.* at 7-10 (citations omitted)).  She points out that neither physician opined as to whether she met or equaled a listing and that the only medical source to do so, state agency physician Dr. Bermudez, specialized in a field (radiology) unrelated to Plaintiff's conditions and did not consider her sarcoidosis, which "is not a common or simple impairment."  (*Id.* at 10).

The Acting Commissioner responds that under the applicable regulations the ALJ has discretion whether to retain a medical expert and that the ALJ did not abuse that discretion here where the record was fully developed but the medical opinions were inconsistent with the relevant evidence.  (Resp., ECF No. 13, at 8 (citations omitted)).  She asserts that the ALJ correctly discounted Dr. Sreih's and Dr. Szporn's opinions for several reasons.  She notes that both were "form reports" constituting "weak evidence at best" under Third Circuit case law and, moreover, that both were completed after the relevant review period.  (*Id.* at 8-9 (citations omitted)).  The Acting Commissioner argues that the ALJ correctly concluded that the physical and mental limitations identified by Dr. Sreih were inconsistent with treatment records from Plaintiff's primary care physician and, additionally, that the mental limitations were less persuasive because Plaintiff received no mental health treatment, including from Dr. Sreih, a rheumatologist.  (*Id.* at 8-9 (citations omitted)).  Similarly, the Commissioner observes that despite finding disabling physical limitations Dr. Szporn often reported largely normal physical examination results and also noted that Plaintiff's shoulder pain improved with injections and other treatment.  (*Id.* at 9 (citations omitted)).  She continues that although the ALJ found these

physicians' opinions unhelpful to assess Plaintiff's functionality, she had other evidence from which she could do so, including clinical reports from her primary care physician showing normal physical results, her improved physical pain with treatment, her ADLs and the overall record showing normal mental health with no mental health treatment. (*Id.* at 10-11 (citations omitted)). The Commissioner concludes that it is irrelevant if the ALJ was mistaken as to when Plaintiff first requested a medical expert because, based on the foregoing, she did not abuse her discretion in denying the request. (*Id.* at 11 & n.1).

In her reply, Plaintiff reiterates that an ALJ must assist the claimant in developing the record and specifies that her argument is that the ALJ failed to fulfill this duty, not that the ALJ should have weighed the evidence differently or afforded greater weight to Dr. Sreih's and Dr. Szporn's opinions as treating physicians. (Reply, ECF No. 14, at 1-2 (citations omitted)). She also accuses the Acting Commissioner of not acknowledging that the ALJ was mistaken about the timing of the request for a medical expert, that the ALJ rejected the request on the basis of opinions she found not persuasive, or that the ALJ relied only on her "own lay speculation" in evaluating the severity and effects of her sarcoidosis and fibromyalgia. (*Id.* at 2).

### 2.    Analysis

Although the ALJ has the burden of developing a full and fair record, *see Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995), the ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. *See* 42 U.S.C. § 423(d)(5)(A). An "ALJ's duty to develop the record does not require a consultative examination unless the claimant establishes that such an examination is necessary to enable the ALJ to make the disability decision." *Thomas v. Halter*, 45 F. App'x 146, 149 (3d Cir. 2002); *see also Jakubowski v. Comm'r of Soc. Sec.*, 215 F. App'x 104, 107 (3d Cir. 2007) ("[A]n ALJ is not required under the Social Security

regulations to seek out medical expert testimony."). Specifically, "[a]n ALJ is not required to obtain an expert opinion as to whether an impairment meets or equals a listing and is fully competent to make an equivalency determination." *Mruk v. Colvin,* No. 13-0321, 2014 WL 3881976, at *7 (M.D. Pa. Aug. 7, 2014) (citations omitted). As long as a medical expert is not required to develop an inadequate record or resolve conflicts, ambiguities, or inconsistencies, an ALJ's decision whether to obtain a medical expert is reviewed for an abuse of discretion. *See Brianna M. v. Kijakazi*, No. 4:22-CV-0376, 2023 WL 4868105, at *16 (M.D. Pa. July 31, 2013); *see also Chantel R.N. v. Kijakazi*, No. 1:21-cv-00138-CMR, 2023 WL 2586219, at *3 (D. Utah Mar. 21, 2023); *Pryborowski v. Colvin*, Civ. No. 13-1038, 2014 WL 3420351, at *8 (W.D. Pa. July 14, 2014); *Basil v. Colvin*, CIV.A. 12-315E, 2014 WL 896629, at *2 (W.D. Pa. Mar. 6, 2014); *Jirau v. Astrue*, 715 F. Supp. 2d 814, 826 (N.D. Ill. 2010).

Here, the record contains well over 1000 pages of medical records from the period at issue. (*See* R. 349-894, 1519-2272); *cf. Kushner v. Comm'r Soc. Sec.*, 765 F. App'x 825, 830 (3d Cir. 2019) ("[A] wealth of medical records from the relevant period were available and included in the record. Accordingly, our precedents did not compel the Commissioner to seek out a medical expert in this case."). Plaintiff argues that, nonetheless, these records include no state agency consultant opinions issued after her diagnosis for sarcoidosis. She acknowledges that the medical evidence includes records and an opinion from Dr. Sreih, the rheumatologist who treated her sarcoidosis, but she maintains that another consultative opinion was required because the ALJ afforded Dr. Sreih's opinion only "little weight." However, she points to no gaps or ambiguities in the record for which it was necessary to obtain an additional medical expert opinion to fill or resolve. *See Schwartz v. Berryhill*, No. 17-854, 2018 WL 3575046, at *4 (W.D. Pa. July 25, 2018). Under the case law, an ALJ is completely capable of making an equivalency

determination herself, *Mruk*, 2014 WL 3881976, at *7, and this is what the ALJ did in this case. (R. 910-11 ("While neither of these impairments [sarcoidosis and uveitis] is specifically included in the listing of impairments, they have nevertheless been evaluated to see if they equal either of these listings.")).  In relevant part, the ALJ explained:

> As noted above, the claimant's uveitis improved with medical treatment and was often found in the records to be stable, her vision was frequently noted to do well, and her symptoms were generally noted to be improved on many occasions (7F/1-3; 29F; 38F; 39F). The claimant's sarcoidosis was not diagnosed until March 2017, over two years after the amended alleged onset date (23F/8). Physical examinations performed during rheumatology visits are somewhat variable, with some positive findings, such as tenderness in the claimant's abdomen, cervical lymphadenopathy, and positive SLR testing, but also many normal findings, such as the claimant being in no acute distress, with full range of motion in her neck, normal lungs, no edema in her lower extremities, and no synovitis in her musculoskeletal system (23F/2-3, 7-8; 39F/4-5, 18-19, 44-45, 58-59, 82, 120). Improvement in the claimant's sarcoidosis was noted with the use of steroids (16F/13, 39F/173). As such, the claimant does not equal any listings related to her uveitis or sarcoidosis.

(R. 911 (additional discussion of these conditions vis-à-vis the potentially applicable listings omitted)).

Plaintiff submits that the ALJ could not have relied upon records from Drs. Sreih and Szporn (and other specialists) at the step three listings analysis while finding their medical opinions entitled to only little or partial weight at the step four formulation of her residual functional capacity.  But the fact that the ALJ did not fully agree with the ultimate conclusions reached by these two physicians did not prohibit her from considering the evidence related to their underlying treatment of Plaintiff when determining if a listing had been met at step three. In light of this evidence, the ALJ determined that Plaintiff did not meet any applicable listings because her sarcoidosis and uveitis improved with treatment and, despite some ongoing positive findings, she often had normal and stable examination results.  (R. 911 (citing R. 477-79, 818,

886-87, 892, 1546-48, 1826-2024)).[3]

Nor did the ALJ merely substitute "her lay intuition" for Dr. Sreih's and Dr. Szporn's medical source opinions when she later afforded them limited weight, as her extensive discussion of the opinions vis-à-vis the medical evidence from these providers and others makes clear. (Pl.'s Br., ECF No. 12, at 8). Regarding these opinions, she wrote:

> I have further considered the July 2017 opinion of the claimant's rheumatologist, Antoine Sreih, M.D., and afford it little weight. Dr. Sreih, a treating source, opined that the claimant would frequently experience pain or other symptoms severe enough to interfere with her attention and concentration. She is incapable of even low stress jobs due to depression and anxiety. She can sit for less than 2 hours and stand/walk for less than 2 hours total in an 8-hour workday. She needs to get up every hour and walk for 20 minutes. She would need unscheduled breaks, but he did not opine regarding how often. She does not need to use a cane or other assistive device while standing/walking. She can rarely lift and carry less than 10 pounds. She can frequent hold her head in a static position and can occasionally look down, turn her head to the right, or look up. She can occasionally climb stairs but can never perform other postural activities. She does not have significant manipulative limitations (20F).

> These limitations are not entirely supported by Dr. Sreih's own rheumatology treatment records. Dr. Sreih found the claimant to have relatively minimal findings during physical examinations he performed (23F/23-, 7-8), and he actually reduced the claimant's prednisone dosage at times (23F/1). Dr. Sreih noted that the claimant's limitations are not likely to produce good or bad days, but he also noted that the claimant experiences mood swings and fatigue.

> These findings are also inconsistent with the other records in the file. Physical examinations performed during primary care visits were largely normal or showed minimal abnormalities (12F/3-4, 9,

---

[3] Although Plaintiff complains that the only state agency physician to opine as to whether any listing had been met, Dr. Bermudez, did so prior to her diagnosis for sarcoidosis and that Dr. Bermudez was specialized in an unrelated area of medicine, (Pl.'s Br., ECF No. 12, at 8), these complaints do not affect the Court's analysis. Dr. Bermudez's opinion is not one of the several medical records cited by the ALJ in support of her conclusion that no listing related to that ailment had been met or equaled. (R. 911).

14, 18, 24, 34-35; 13F/4-5, 12, 19, 23, 28, 33-34, 40, 48, 53; 16F/5-6, 11, 17, 22, 30). The claimant reported improvement in her physical pain on many occasions (12F/16; 15F/1, 7). At times, she reported feeling pretty good and her general health was described as good (16F/7). Dr. Sreih's restrictions regarding claimant's cervical range of motion are not supported by the evidence. Physical examination findings regarding claimant's cervical range of motion have been in the normal range during her examinations with Dr. Powell and Dr. Ligon (1F, 13F, 16F, 39F, 41F) and somewhat reduced during pain management visits (15F, 36F). However, an EMG was negative for cervical radiculopathy or other neuromuscular abnormality and claimants MRI of the cervical spine revealed mild to moderate findings (11F/3; 40F/66). Claimant also admitted to being able to perform many activities of daily living.

Regarding Dr. Sreih's opinion that the claimant has depression and anxiety, which precludes the claimant from even low stress work, I note that neither psychology nor psychiatry is his specialty. The claimant is under no mental health treatment, nor did she testify to any mental health treatment during the period of review. Moreover, every mental status examination from her PCP notes her to be alert and cooperative with normal affect and mood (41F/59, 75). She denied depression and anxiety on multiple visits (41F/23, 59). Furthermore, the doctor's 2017 mental status exams conducted during physical examinations revealed alert, oriented times three, normal affect, normal judgment, and normal insight (23F/2, 8). In addition, as to the claimant's uveitis, Dr. Sreih is not an ophthalmologist. Nonetheless, Dr. Sreih did not list any visual limitations due to uveitis. Furthermore, the most recent objective medical evidence documents that the claimant's uveitis is stable and controllable with eye drops prescribed by Mid Atlantic Retina (7F/6-7; 16F/3; 29F/1-2; 38F). Moreover, these findings are also somewhat inconsistent with the limitations assessed by Dr. Szporn below in Exhibit 22F. While I do not find all of Dr. Szporn's limitations to be supported by or consistent with the records, I note that he found the claimant capable of lifting a great deal more than Dr. Sreih noted, and generally found the claimant to be less limited than did Dr. Sreih.

I have also considered the July 2017 opinion of the claimant's orthopedist, Monroe Szporn, M.D., and afford it partial weight. Dr. Szporn, a treating source, opined that claimant would occasionally experience pain or other symptoms severe enough to interfere with her attention and concentration. She is capable of low stress jobs. She can walk 1-2 blocks. She can sit for about 4 hours and stand/walk for about 2 hours total in an 8-hour workday. She needs to get up every 90 minutes and walk for 5 minutes. She would

need unscheduled breaks every 3-4 hours for 15 minutes. She needs to elevate her legs to waist level while seated 25% of the time. She would possibly need to use a cane or other assistive device while standing/walking. She can frequently lift 10 pounds, occasionally lift 20 pounds, and rarely lift 50 pounds. She can occasionally hold her head in a static position, look down, turn her head to the right, or look up. She can never climb ladders, rarely crouch/squat, and occasionally perform other postural activities. She has a number of bilateral manipulative limitations, greater on the left side than the right side. She would be absent about 2 days per month (22F).

These limitations are only somewhat supported by Dr. Szporn's examination findings. Dr. Szporn often found largely normal findings during physical examinations, and he noted improvement in the claimant's right shoulder pain from the use of injections and other treatment modalities (17F). These limitations are also somewhat consistent with the overall evidence available at the hearing level. The overall evidence shows that, while the claimant has treated with a number of specialists, the objective findings are generally mild to moderate, the claimant is not shown to use an ambulatory assistive device, and improvement is noted in response to many treatment modalities. Findings regarding claimant's cervical range of motion have been in the normal range during her examinations with Dr. Powell and Dr. Ligon (39F) and somewhat reduced during pain management visits. However, an EMG was negative for cervical radiculopathy or other neuromuscular abnormality and claimants MRI of the cervical spine revealed mild to moderate findings (11F/3; 40F/66). Claimant also admitted to being able to perform many activities of daily living. I additionally note that Dr. Szporn's limitations on lifting and carrying are consistent with at least light work. Dr. Szporn's findings regarding the need for absences are speculative and his restrictions regarding leg elevation are not associated with a medical finding in the record and therefore are not supported.

(R. 919-21).

From this fulsome discussion, Plaintiff selects a single instance in which the ALJ

determined that Plaintiff's cervical spine MRI results were inconsistent with Dr. Sreih's findings

and argues that the ALJ could not have reached this determination where Dr. Szporn noted in

treatment records that the MRI was "consistent" with Plaintiff's symptoms and limitations.  (Pl.'s

Br., ECF No. 12, at 8 (citing R. 848, 920)).  However, the limitations identified by Dr. Sreih in

his opinion and Dr. Szporn in the cited record differ.  Although the former opined that Plaintiff

can only "occasionally look down, turn her head to the right or look up," the latter, after

physically examining Plaintiff, found that she was "comfortable" with "flexion chin to chest,

extension 20° and rotation right and left degrees over 50°."  (R. 848).  Accordingly, far from

requiring the ALJ to accept the limitations proffered by Dr. Sreih, Dr. Szporn's discussion of

Plaintiff's MRI results in connection with her cervical functionality serves as additional evidence

for the ALJ's determination that Dr. Sreih's opinion was overly restrictive.  Indeed, as the ALJ

also noted, such "largely normal findings during physical examinations" also undercut Dr.

Szporn's own opinion that Plaintiff can only "occasionally hold her head in a static position, look

down, turn her head to the right, or look up," because upon examination Dr. Szporn had observed

that Plaintiff could "comfortabl[y]" flex, extend and rotate her neck.  (R. 848, 920).

Because the ALJ was competent to make the equivalency determinations at issue without

the need for medical expert evidence to fill any gaps or resolve any ambiguities or

inconsistencies in the record, this Court finds no abuse of discretion in her denial of Plaintiff's

request for additional opinion evidence.[4]  *Pryborowski*, 2014 WL 3420351, at *8; *Mruk*, 2014 WL

3881976, at *7; *Brianna M.*, 2023 WL 4868105, at *16.  Accordingly, remand on this basis is

denied.

**B.**      **Subjective Complaints Regarding Fibromyalgia**

**1.**      **The Parties' Positions**

Plaintiff asserts that the ALJ failed to follow the requirements of SSR 12-2p, which

---

[4]  Because the ALJ acted within her discretion in denying the request for another
consultative expert, it is, as the Acting Commissioner notes, "irrelevant" if she was mistaken
about the timing of Plaintiff's request.  (Resp., ECF No. 13, at 11; *see also* R. 905).  Even if she
had noted Plaintiff's 2021 request, she retained the discretion to deny that request for the reasons
set forth herein.

outlines the procedure for evaluating benefit claims based on fibromyalgia.  (Pl.'s Br., ECF No. 12, at 11-12).  She observes that multiple circuit courts of appeal have held that an ALJ may not discount a claimant's subjective complaints regarding fibromyalgia based on a lack of substantiating objective evidence.  (*Id.* at 11 (citing *Arakas v. Comm'r of Soc. Sec.*, 983 F.3d 83, 96-97 (4th Cir. 2020))).  She contends that in rejecting Plaintiff's complaints about the disabling nature of her condition the ALJ repeatedly cited Plaintiff's ADLs but ignored additional qualifying information about them, such as her ability to perform them only with assistance or in those instances when she was "feeling good."  (*Id.* at 12-13 (citing R. 267-68)).  Plaintiff points to evidence that she spent most of her time sleeping and that she had "extreme difficulty" performing household chores.  (*Id.* at 13 (citing R. 99, 360, 422, 763, 776)).  She also argues that the Acting Commissioner failed to consider the side effects of her medications as required by the applicable regulations and instead concluded without evidence that she had responded well to medication.  (*Id.* at 13-14 (citations omitted)).

The Acting Commissioner responds that the ALJ properly evaluated Plaintiff's fibromyalgia pursuant to the five-step process set forth in SSR 12-2p, including at step three where the ALJ explained that Plaintiff's fibromyalgia met or equaled no listing and at step four where she considered the condition in formulating Plaintiff's RFC.  (Resp., ECF No. 13, at 11-12).  The Acting Commissioner attempts to distinguish *Arakas*.  She claims that, unlike in that case, the ALJ here conducted "a holistic review of the longitudinal record" and did not rely upon objective evidence or its absence as the "chief or definitive reason" to discount Plaintiff's complaints, even if she did "discuss" it as required under the regulations.  (*Id.* at 12-13 (citations omitted)).  She maintains that the ALJ instead focused on Plaintiff's symptoms and cited objective medical findings "primarily as part of accurately recounting and evaluating Plaintiff's

25

entire medical history" because Plaintiff's other conditions "overlapped" with her fibromyalgia. (*Id.* at 13).  She submits that *Arakas* was remanded because the ALJ mischaracterized the evidence, whereas in this case the ALJ accurately described Plaintiff's ADLs and subjective statements to her medical providers and the agency.  (*Id.* at 13-14 (citing R. 911-18)).  The Acting Commissioner closes by noting instances in the record when Plaintiff described performing more physically demanding tasks, walking or doing light exercise to perform her range of motion.  (*Id.* at 14 (citing R. 843, 918, 1763, 1768, 2195)).

Plaintiff replies briefly that the ALJ improperly determined that she was not as limited as alleged because of a lack of objective findings, notwithstanding the Acting Commissioner's insistence that that was not the basis for her determination.  (Reply, ECF No. 14, at 2).  She also reiterates that the ALJ found that her fibromyalgia met or equaled no listing primarily because "many physical examinations demonstrate mild to normal findings" and that his focus on objective evidence violates SSR 12-2p.  (*Id.* (citations omitted)).  She disputes that the ALJ accurately characterized evidence of her ADLs, noting that neither the ALJ nor the Acting Commissioner acknowledged her need for assistance in completing activities.  (*Id.* at 3).

### 2.    Analysis

SSR 12-2p "provides guidance on how [the Social Security Administration] develop[s] evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how [it] evaluates fibromyalgia in disability claims . . . ."  SSR 12-2p, 2012 WL 3104869, at *1 (2012).  In relevant part, the ruling provides that once the ALJ has found a medically determinable impairment in the form of fibromyalgia, he or she should consider whether objective medical evidence substantiates the claimant's statements about the intensity, persistence and limiting effects of his or her symptoms.  *Id.* at *5; *see also* 20 C.F.R. §§

404.1529(c)(2), 416.929(c)(2).  If it does not, the ALJ should consider the evidence as a whole,

including ADLs; the location, duration, frequency and intensity of symptoms; precipitating and

aggravating factors; the type, dosage, effectiveness and side effects of medication taken to

alleviate symptoms; other treatment; and any other factors regarding the claimant's limitations.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 12-2p.

As the Fourth Circuit Court of Appeals explained in *Arakas*, cited by both parties:

> A growing number of circuits have recognized fibromyalgia's
> unique nature and have accordingly held that ALJs may not
> discredit a claimant's subjective complaints regarding fibromyalgia
> symptoms based on a lack of objective evidence substantiating
> them. [Citing case from the First, Second, Sixth, Seventh, Eighth
> and Ninth Circuit Courts of Appeal.]
>
> Today, we join those circuits by holding that ALJs may not rely on
> objective medical evidence (or the lack thereof)—even as just one
> of multiple factors—to discount a claimant's subjective complaints
> regarding symptoms of fibromyalgia or some other disease that
> does not produce such evidence. Objective indicators such as
> normal clinical and laboratory results simply have no relevance to
> the severity, persistence, or limiting effects of a claimant's
> fibromyalgia, based on the current medical understanding of the
> disease.  If considered at all, such evidence—along with consistent
> trigger-point findings—should be treated as evidence
> *substantiating* the claimant's impairment. We also reiterate the
> long-standing law in our circuit that disability claimants are
> entitled to rely exclusively on subjective evidence to prove the
> severity, persistence, and limiting effects of their symptoms.

983 F.3d at 97-98 (emphasis in original).

Here, in determining that Plaintiff's fibromyalgia did not meet or equal any listing, the

ALJ explained:

> While there is no listing directly applicable to fibromyalgia, the
> claimant's fibromyalgia has been evaluated with respect to the
> guidance provided in SSR 12-2p to see if it medically equals a
> listing either alone or in combination with another impairment.
> However, the evidence does not demonstrate that the claimant's
> fibromyalgia medically equals any of the listed impairments, either
> alone or in combination with any other impairment(s). I have

evaluated the claimant's fibromyalgia under the listings, specifically listing14.09D, but I find that no listing is medically equaled. I do not find that the claimant's fibromyalgia causes the claimant a marked limitation in limitation of activities of daily living; limitation in maintaining social functioning; or limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. The claimant was largely treated with Duloxetine prescribed by her rheumatologist for her fibromyalgia (18F; 21F; 23F; 39F/1-145). **Many physical examinations demonstrate mild to normal findings (12F/3-4, 9, 14, 18, 24, 34-35; 13F/4-5, 12, 19, 23, 28, 33-34, 40, 48, 53; 16F/5-6, 11, 17, 22, 30)**. The claimant also admitted to being able to prepare simple meals, such as eggs, bacon, soup, and sandwiches; do the laundry; travel on public transportation on a lowered bus; and shop in stores for groceries along with her home health aide (2E). As such, the claimant's fibromyalgia fails to medically equal any of the listed impairments.

(R. 916) (emphasis added).

Plaintiff primarily takes issue with the bolded sentence above, asserting that under SSR 12-2p and *Arakas* the ALJ should not have relied upon Plaintiff's normal physical examination results to discount the severity of her fibromyalgia.[5] (Pl.'s Br., ECF No. 12, at 11). Plaintiff is correct. Under SSR 12-2p, as confirmed by *Arakas*, objective medical results should only ever be considered insofar as they "substantiate" the claimant's subjective statements about the intensity, persistence and limiting effects of his or her symptoms. SSR 12-2p; *Arakas*, 983 F.3d at

---

[5] Plaintiff also argues that later in the five-step sequential analysis, when the ALJ was formulating the RFC, the ALJ improperly concluded that Plaintiff was not as limited by her fibromyalgia as claimed "based largely on an alleged lack of objective findings." (Pl.'s Br., ECF No 12, at 11 (citing R. 916)). However, the Court has reviewed the cited portion of the decision and finds it impossible to discern the basis for the ALJ's conclusion because she considered Plaintiff's fibromyalgia in conjunction with her sarcoidosis and abdominal lymphadenopathy and the ALJ's grounds for discounting the severity of these conditions appear to relate primarily to the latter two. (R. 916). The only reference to fibromyalgia specifically is that it was "treated with Duloxetine," albeit with unstated results. (*Id.*). In any event, because the Court finds that remand is warranted because the ALJ improperly relied upon objective results in finding that Plaintiff's fibromyalgia met or equaled no listing, the Court does not decide whether the ALJ committed the same error when she discounted the Plaintiff's statements regarding her fibromyalgia during the formulation of her RFC.

97-98.  In this case, the ALJ relied upon objective findings to undercut or refute Plaintiff's

statements.  (R. 916).  The Acting Commissioner attempts to recast the ALJ's approach as not

requiring objective evidence but as "conducting a holistic view of the longitudinal record," as

required by SSR 12-2p.  (Resp., ECF No. 13, at 12 (citing *Arakas*, 983 F.3d at 101-02)); *see* SSR

12-2p ("When a person alleges [fibromyalgia], longitudinal records reflecting ongoing medical

evaluation and treatment from acceptable medical sources are especially helpful in establishing

both the existence and severity of the impairment.").  However, although the ALJ should

consider longitudinal records,[6] insisting on confirmatory objective results – such as positive

physical examination findings – within those records is improper.  *Lisa v. Sec. of the Dep't of

Health & Human Servs.*, 940 F.2d 40, 45 (2d Cir. 1991) ("physical examinations [of people with

fibromyalgia] will usually yield normal results"); *see also Green-Younger v. Barnhart*, 335 F.3d

99, 108-09 (2d Cir. 2003) ("The ALJ effectively required 'objective' evidence for a disease

[fibromyalgia] that eludes such measurement.").

     The Acting Commissioner also tries to distinguish *Arakas* on the basis that the ALJ did

not cite the lack of objective medical evidence as the "chief or definitive reason" for discounting

Plaintiff's subjective statements regarding her fibromyalgia, but *Arakas* makes clear that "ALJs

may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple

factors—to discount a claimant's subjective complaints regarding symptoms of

fibromyalgia . . . ."  983 F.3d at 97.  The Acting Commissioner further claims that *Arakas* is

---

     [6]  Moreover, the Court disagrees that the ALJ was simply conducting a review of the record or, as argued elsewhere in the Acting Commissioner's brief, only "recounting and evaluating Plaintiff's entire medical history."  (Resp., ECF No. 13, at 13).  The offending sentence occurred in the midst of a paragraph explaining why Plaintiff's fibromyalgia purportedly did not meet or equal a listing and was immediately preceded and followed by additional reasons that no listing applied.  (R. 911).

distinguishable because the ALJ in that case "also misstated or mischaracterized . . . material facts." (Pl.'s Br., ECF No. 13, at 13 (citing *Arakas*, 983 F.3d at 99)). But *Arakas* explicitly stated that this fact-based reason for remanding the case was *in addition to* the ALJ's "legal error" already warranting remand.[7] *See* 983 F.3d at 96, 98 ("The ALJ's discrediting of Arakas's subjective complaints was not only legally erroneous, but also unsupported by substantial evidence. Specifically, the ALJ erred by[, *inter alia*,] selectively citing evidence from the record as well as misstating and mischaracterizing material facts . . . ."). Due to the ALJ's legal error in evaluating Plaintiff's fibromyalgia, this matter is remanded.

## VI.    CONCLUSION

For the reasons set forth above, Plaintiff's request for review is **GRANTED**. This matter is remanded for further proceedings consistent with this memorandum.

BY THE COURT:

  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge

---

[7] Because the ALJ's improper consideration of objective medical evidence in discounting Plaintiff's subjective statements regarding the persistence, intensity and severity of her fibromyalgia requires remand, the Court does not address the additional dispute between the parties regarding whether the ALJ accurately characterized her ability to carry out ADLs and the side effects of her medication. (Pl.'s Br., ECF No. 12, at 13; Resp., ECF No. 13, at 13-14).